1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

7
8

THE ESTATE OF CALEB BROWN, by and through BRITTNEY TEANEY, the Personal Representative,

No.

**COMPLAINT FOR WRONGFUL DEATH**

9

Plaintiff,

10

v.

11
12
13
14

COALVIEW RECOVERY GROUP, LLC, a Delaware Limited Liability Company; DREDGE CENTRAL, LLC, a Delaware Limited Liability Company; DREDGE CENTRAL OF TENNESSEE, LLC, a Tennessee Limited Liability Company; and DOES 1-10,

15

Defendants.

16
17
18
19

COMES NOW the Plaintiff, above-named, by and through her attorneys of record, Stritmatter Kessler Koehler Moore and the Law Offices of Kamela James, and for cause of action against the Defendants, alleges and states as follows:

20

**I. STATUS OF THE PARTIES**

21
22
23
24

1.1     Brittney Teaney was appointed as personal representative/administrator of the Estate of Caleb Brown in Lewis County Superior Court Cause Number 19-4-0033121 and brings this claim on behalf of the Estate of Caleb Brown and on behalf of J.L.B., Caleb Brown's minor

COMPLAINT FOR WRONGFUL DEATH - 1

son, a beneficiary under RCW 4.20.010, 4.20.020, 4.20.046, and 4.20.060.  Brittney Teaney resides in Lewis County, Washington.

1.2     Defendant COALVIEW RECOVERY GROUP, LLC is a Delaware Limited Liability Company with a principal place of business in Pennsylvania that at all material times did business in the State of Washington.

1.3     Defendant DREDGE CENTRAL, LLC is a Delaware Limited Liability Company with a principal place of business in the State of Tennessee.  Defendant DREDGE CENTRAL, LLC is generally in the business of designing and manufacturing dredges for use on bodies of water and is a product manufacturer as defined in RCW 7.72.010(2).

1.4     Defendant DREDGE CENTRAL OF TENNESSEE, LLC is a Tennessee Limited Liability Company that, on information and belief, is a successor entity to DREDGE CENTRAL, LLC that assumed the assets and liabilities of DREDGE CENTRAL, LLC, including the liability of DREDGE CENTRAL, LLC for the subject incident.  Defendant DREDGE CENTRAL OF TENNESSEE, LLC's principal place of business is in the State of Tennessee.  Defendant DREDGE CENTRAL OF TENNESSEE, LLC is generally in the business of designing and manufacturing dredges for use on bodies of water and is a product manufacturer as defined in RCW 7.72.010(2).

1.5     DOES 1-10 are business entities whose names are unknown to Plaintiff at this time, and therefore fictitious names are used.  DOES 1-5 are business entities related to or affiliated with Defendant COALVIEW RECOVERY GROUP, LLC, such as holding companies or parent companies.  DOES 1-5 are not Washington corporations and do not have their principal place of business in Washington.  When their true identity is known, they will be properly named.  DOES 6-10 are business entities related to or affiliated with Defendants DREDGE CENTRAL, LLC and

COMPLAINT FOR WRONGFUL DEATH - 2

DREDGE CENTRAL OF TENNESSEE, LLC, such as holding companies or parent companies. DOES 6-10 are not Washington corporations and do not have their principal place of business in Washington. When their true identity is known, they will be properly named.

## II. JURISDICTION AND VENUE

2.1    Plaintiff brings this action pursuant to 28 U.S.C. § 1332(a) on the basis of diversity of citizenship and on the basis that the amount in controversy exceeds the jurisdictional amount of $75,000 as therein provided.

2.2    Venue is proper in the Western District of Washington at Tacoma because this case involves a death that occurred in Lewis County, Washington, which is within this Court's geographic region.

## III. FACTS FORMING THE BASIS FOR LIABILITY

3.1    For many years, Trans Alta Centralia Mining, LLC ("Trans Alta") operated a coal mine in Centralia, Washington. Slurry consisting of coal fines, water, rocks, and dirt was produced during the processing and washing of coal. Trans Alta disposed of the slurry by depositing it in impoundment "ponds." There were three slurry impoundment "ponds" on the Trans Alta coal mine property that contained coal fines, water, dirt, and other materials in slurry form.

3.2    The Trans Alta coal mine closed in 2006, and government authorities required that the ponds be remediated as part of the process of closing the mine.

3.3    In 2013, Trans Alta entered into an agreement with Coalview Centralia, LLC for the construction of a coal waste slurry processing and fine coal recovery facility ("Processing Plant") at the coal mine property. The coal waste slurry in the impoundment ponds was to be

COMPLAINT FOR WRONGFUL DEATH - 3

removed from the ponds and transmitted to the Processing Plant through the use of a dredge working on the ponds that would convey the slurry to the Processing Plant via a pipeline.

3.4     Coalview Centralia, LLC entered into a subcontractor agreement with Defendant Coalview Recovery Group, LLC, to provide management, consulting and operational services for the conduct of Coalview Centralia, LLC's dredging obligations under its agreement with Trans Alta.[1]

3.5     Defendant Coalview Recovery Group, LLC's relationship with Coalview Centralia, LLC was that of an independent contractor.[2]

3.6     Defendant Coalview Recovery Group, LLC agreed to design, construct, install, and operate a dredge on the impoundment ponds for the purpose of dredging slurry from the bottom of the ponds and transporting it to the Processing Plant so that non-coal materials could be separated out from usable coal.[3]

3.7     Financing for the coal fines recovery project included $26.5 million in Environmental Facilities Revenue Bonds issued by the Washington Economic Development Finance Authority (WEDFA).  Consistent with the subcontractor agreement described above, documentation related to the issuing of bonds by WEDFA to fund the coal fines[4] recovery work by Coalview Centralia, LLC, stated that Coalview Centralia, LLC had engaged Defendant

---

[1] Operating and Management Agreement, ¶ 3; Exclusive Dredging Services Agreement, p.1; WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project) at p.S-3 to S-4 ("Pursuant to an Exclusive Dredging Services Agreement between [Coalview Centralia, LLC] and CRG . . ., [Coalview Centralia, LLC] has subcontracted all of its dredging obligations under the Processing Agreement to CRG.").

[2] Operating and Management Agreement, ¶ 5.

[3] Contractor's Consent to Collateral Assignment (Dredging Agreement) at p.2, Section C; Exclusive Dredging Services Agreement at ¶ 2.01.

[4] Coal fines are smaller particles of usable coal that are recoverable from coal slurry.

COMPLAINT FOR WRONGFUL DEATH - 4

Coalview Recovery Group, LLC "to complete the dredging and recovery process" and that Defendant Coalview Recovery Group, LLC's onsite management services would include "all facets of dredge operations, management and operation of fine coal recovery projects and operation of thickener systems in the disposal of slurry refuse."[5]  It was further represented in the WEDFA documents that Defendant Coalview Recovery Group, LLC would "provide management, consulting and operational services to [Coalview Centralia, LLC][6] and will be responsible for the day-to-day operations, management and administration of [Coalview Centralia, LLC], and for the conduct of [Coalview Centralia, LLC's] regular business."[7]

3.8    It was further stated in the WEDFA documentation that Defendant Coalview Recovery Group, LLC would "provide both the dredge and Project operations services under the Dredging Services Agreement and the O&M Agreement, respectively, for the term of the Project Agreements."[8]  The terms of both the Master Services Agreement and the Exclusive Waste Coal Slurry Recovery and Processing Agreement between Coalview Centralia, LLC and Trans Alta Centralia Mining, LLC were December 20, 2013 through December 31, 2025.[9]

---

[5] WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project) at p.S-3; WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at p.20.  The WEDFA Limited Offering Memorandum was signed by David Schwedel on behalf of Coalview Centralia, LLC.  WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at p.72.

[6] The WEDFA Memorandum uses the term "Company," which is defined as meaning "Coalview Centralia, LLC." WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at Appendix p. A-3.

[7] WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at p.3, 21.

[8] WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at p.25.

[9] Master Services Agreement at ¶ 2.01; Exclusive Waste Coal Slurry Recovery and Processing Agreement at ¶ 2.01.

COMPLAINT FOR WRONGFUL DEATH - 5

3.9     It was further stated in the WEDFA documentation that Coalview Centralia, LLC had no operating history and had engaged Defendant Coalview Recovery Group, LLC "to operate the Project facilities pursuant to the O&M Agreement and the Dredging Services Agreement," and that Coalview Centralia, LLC would "be dependent upon [Coalview Recovery Group, LLC] to discharge its obligations under the Project Agreements."[10]

3.10    Coalview Centralia, LLC was a new company[11] without experience operating dredges for the recovery of coal fines from impoundment ponds and relied on Defendant Coalview Recovery Group, LLC to oversee safe operation of the dredge.

3.11    Coalview Centralia, LLC agreed to pay Defendant Coalview Recovery Group, LLC a total of $3,000,000 for Coalview Recovery Group, LLC's design, construction, and installation of the dredge.[12]

3.12    Defendant Coalview Recovery Group, LLC was responsible for maintaining the dredge and all related equipment in good working order, including preventative maintenance and for promptly repairing or replacing equipment as necessary.[13]

---

[10] WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at p.61

[11] WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at p.60, 61 "[Coalview Centralia, LLC] has no operating history, and has engaged a related entity, Coalview Recovery Group, LLC, to operate the Project facilities pursuant to the O&M Agreement and the Dredging Services Agreement.  [Coalview Centralia, LLC] will be dependent upon CRG to discharge its obligations under the Project Agreements.").

[12] Exclusive Dredging Services Agreement at ¶ 5.01.

[13] Exclusive Dredging Services Agreement at ¶ 2.01.

COMPLAINT FOR WRONGFUL DEATH - 6

3.13    Coalview Centralia, LLC agreed to pay Defendant Coalview Recovery Group, LLC Operating Payments for costs associated with the repair and maintenance of the dredge and related equipment.[14]

3.14    Defendant Coalview Recovery Group, LLC agreed to "perform all services and work in accordance with generally accepted industry practices, standards and procedures."[15]

3.15    Defendant Coalview Recovery Group assumed "responsibility and liability for any and all damage or injury of any kind or nature whatsoever (including death) to all persons, whether employees, agents, consultants or representatives of CRG or otherwise, and to all property, caused by, resulting from, arising from, arising out of, or occurring in connection [with] the operation of the dredge . . . ."[16]

3.16    Coalview Centralia, LLC agreed to pay Defendant Coalview Recovery Group, LLC an annual base consulting and management fee of $250,000, to be increased annually, payable in equal monthly installments.[17]   The term of the Exclusive Dredging Services Agreement between Coalview Centralia, LLC and Defendant Coalview Recovery Group, LLC was "the date on which the Processing Agreement becomes effective and shall continue for so long as the Processing Agreement remains in full force and effect."[18]   As stated above, the term of the Processing Agreement was December 20, 2013 through December 31, 2025.

---

[14] Exclusive Dredging Services Agreement at ¶ 5.02.

[15] Exclusive Dredging Services Agreement at ¶ 2.04.

[16] Exclusive Dredging Services Agreement at ¶ 2.05.

[17] Operating and Management Agreement, ¶7.

[18] Exclusive Dredging Services Agreement at ¶ 4.01.

COMPLAINT FOR WRONGFUL DEATH - 7

3.17    Defendant Coalview Recovery Group, LLC originally provided a dredge manufactured by Rohr-Idreco for the project.   The dredge used a water jetting head to loosen material from the bottom of the ponds before being delivered to the suction head to be pumped to the Processing Plant through a pipeline.





COMPLAINT FOR WRONGFUL DEATH - 8

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18
19



20
21
22
23
24

    3.18    In 2015, Coalview Centralia, LLC entered into an agreement with Defendant

Dredge Central, LLC to modify a used dredge to replace the dredge that had been used since

beginning the coal fines recovery work at the Trans Alta mine.  Modifications to the dredge

included replacing a diesel engine with four electric motors.

COMPLAINT FOR WRONGFUL DEATH - 9

1

2

3

4

5

  3.19  As part of the change of the dredge from diesel to electric, Defendant Dredge Central added a new stern pontoon to support an electrical transformer.  A plate on the transformer stated that it weighed 10,140 pounds.  A Motor Control Center (VFD House) was also added, located on the stern end of the center hull.  Plates on motors on the modified dredge indicated that they weighed hundreds and thousands of pounds.

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22



23

24

413 - 8th Street
Hoquiam, WA  98550
Tel: 360-533-2710

STRITMATTER KESSLER KOEHLER MOORE

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20



21
22
23
24

COMPLAINT FOR WRONGFUL DEATH - 11

1    3.20    Documents related to the bonds issued by the Washington Economic Development

2    Finance Authority stated that Defendant Coalview Recovery Group, LLC was also involved in the

3    design of the dredge.[19]

4    3.21    Water was added to the first compartment of the starboard side pontoon on the

5    modified dredge to counter-balance the additional weight of the electrical transformer that was

6    added to the port side of the new stern pontoon.

7    3.22    Defendant Dredge Central designed the used dredge with a cutter (auger) head

8    (depicted below) rather than a water jetting head, which the original Rohr-Idreco dredge had.



23   ───────────────
     [19] WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering
     Memorandum at p.23 ("The feed to the recovery system is accomplished by using a CRG-designed all-electric
24   hydraulic coal dredge with a specially-designed cutter head.").

COMPLAINT FOR WRONGFUL DEATH - 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



3.23    A 7,200 volt power cable that ran to the dredge from shore provided electric power to the dredge.

3.24    The 7,200 volt transformer on the stern pontoon of the dredge, as designed by Defendant Dredge Central, LLC and provided by Defendant Coalview Recovery Group, LLC, was not marine-rated and was not properly sealed to prevent water intrusion into the electrical equipment that it contained.

3.25    The dredge was approximately 72 feet long and 17 feet wide.

3.26    Defendant Dredge Central, LLC shipped the modified dredge to the Trans Alta mine in Centralia on four semi-truck loads.  Defendant Dredge Central, LLC employees were involved in assembling the dredge at the Trans Alta mine and training workers on the operation of the dredge.

3.27    The dredge was moved around the impoundment pond by three winches with cables attached to anchor points on the shore, by reeling in or spooling out cables.

COMPLAINT FOR WRONGFUL DEATH - 13

1

2

3.28     The stern winch was located at approximately the center of the stern pontoon, next to the transformer, and at an elevated position.



3.29     The front starboard and port winches were mounted at the front of the dredge operator's cabin.

413 - 8th Street
Hoquiam, WA  98550
Tel: 360-533-2710

STRITMATTER KESSLER KOEHLER MOORE

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20



21      3.30    The dredge recovered coal slurry from the bottom of the impoundment pond by

22  using a cutting head that was lowered into the water from an A frame using a winch.

23
24

COMPLAINT FOR WRONGFUL DEATH - 15

3.31    When the cutter head assembly was up (out of the water), the bow (forward part of the hull) of the dredge lowered in the water.

3.32    When the cutter head assembly was down (lowered into the water), the bow of the dredge lifted up, and the stern of the dredge lowered into the water.

3.33    When the dredge was modified by Defendant Dredge Central, the slurry pump that came with the dredge was replaced with a larger, heavier model.  The larger slurry pump required reinforcement of the floor of the center hull to support it.



3.34    The slurry pump, powered by a 500 horsepower electric motor, pulled the material loosened by the cutting head into the inlet pipe on the dredge.  (The original slurry pump was 400 horsepower.)  The slurry pump pushed the slurry into a discharge pipe and on to the processing plant on shore through a pipeline.

413 - 8th Street
Hoquiam, WA  98550
Tel: 360-533-2710
STRITMATTER KESSLER KOEHLER MOORE

3.35    According to documents prepared by Trans Alta that describe its investigation of the incident, there were no documented engineered designs of the modifications to the dredge by Defendant Dredge Central.

3.36    On March 6, 2016, the dredge manufactured by Defendant Dredge Central was put into operation by Coalview Centralia, LLC.[20]

3.37    Flotation for the dredge was provided by pontoons on the starboard and port sides, pontoons on the stern section, and the center hull.  The starboard and port pontoons on the main hull were supposed to have four sealed compartments each.  The stern pontoon had two sealed compartments (the port and starboard compartments).

3.38    As designed by Defendant Dredge Central, LLC and provided by Defendant Coalview Recovery Group, LLC, the pontoon compartments did not have any means for someone to check for the presence of water without opening large round hatches.  Having the large round hatches open on a pontoon compartment allowed water to quickly fill a pontoon compartment if the pontoon compartment went below the water level.  Options that could have been provided to check for the presence of water in the pontoons include sounding tubes or float switches.

3.39    Electric motors on the dredge were replaced multiple times in the 2016 to 2018 time period after the hull had taken on enough water to submerge and destroy the electric motors.

3.40    The dredge operator's cabin had metal doors with windows on the starboard and port sides.  The starboard door did not line up properly with the door frame, and the plunger of the doorknob did not engage the door frame.  Opening and closing the starboard door required significant force.

---

[20] MSHA Citation/Order 9376237, 3/25/19.

COMPLAINT FOR WRONGFUL DEATH - 17

413 - 8th Street
Hoquiam, WA  98550
Tel: 360-533-2710

STRITMATTER KESSLER KOEHLER MOORE



3.41     The doorknob assembly on the doors in the dredge operator's cabin were replaced about once a year.

3.42     In July 2018, Coalview Centralia, LLC employee Legrand Denetclaw reported that the dredge's starboard pontoon was leaking.

3.43     On at least two occasions in September and October 2018, Coalview Centralia, LLC employee Legrand Denetclaw refused to operate the dredge because he believed it to be unsafe.

3.44     On December 29, 2018, Caleb Brown, age 25, was employed as a Plant Operator by Coalview Centralia, LLC.  He began his shift on December 29, 2018 at approximately 6:00 p.m.

3.45     At approximately 6:30 p.m., Mr. Brown drove to impoundment pond 3C to relieve William Bachman, who had been operating the suction dredge and was going off shift.  Mr. Bachman told Mr. Brown that the walking surface of the starboard side of the stern pontoon was

COMPLAINT FOR WRONGFUL DEATH - 18

around one inch below the water surface.  Mr. Bachman released some tension on the stern cable, which brought the pontoon up about four inches above the water line.

3.46    At approximately 6:53 p.m., Gregory Raley, who was a Plant Operator working in the control room, radioed Mr. Brown to relay flow information.  Mr. Brown told Mr. Raley that clear water would be coming through, because he was going to pump out the pontoon.

3.47    At approximately 7:14 p.m., Mr. Raley noticed that output from the dredge had stopped flowing into the Processing Plant.  He attempted to radio Mr. Brown but received no response.  At about the same time, Mathew Rumley and Steven Strasser, who were also Plant Operators, were checking a light plant near the power box for the dredge.  Mr. Rumley noticed that the power indicator lights for the dredge were not on.  Mr. Rumley radioed Mr. Raley to alert him that there was no power to the dredge and that he could not see the dredge.

3.48    Mr. Rumley then traveled by boat to check on the dredge.  When he reached the dredge, he found that it had sunk, with only the A-frame protruding out of the water.  The dredge had sunk in about 20 feet of water.

STRITMATTER KESSLER KOEHLER MOORE

413 - 8th Street
Hoquiam, WA  98550
Tel: 360-533-2710

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



3.49    Fire department, law enforcement, and emergency medical personnel arrived after 8:00 p.m. and began searching for Mr. Brown.  The search was called off at approximately 10:30 p.m. due to weather conditions and poor visibility.

3.50    The search resumed during daylight hours on December 30, 2018.  Mr. Brown's body was found in the dredge operator's cabin at approximately 2:35 p.m.  He was wearing a flotation device.  The rescue divers reported that it was difficult for them to open the door on the dredge operator's cabin.  An autopsy concluded that Mr. Brown had drowned.

3.51    According to an investigation by the Mine Safety and Health Administration (MSHA), data recorded by Trans Alta showed that an electrical fault occurred in the 7200 volt dredge circuit at 7:19 p.m.

COMPLAINT FOR WRONGFUL DEATH - 20

3.52    Because an electrical safety mechanism on shore had been disabled, the flow of electricity to the dredge did not stop as the dredge sank and filled with water.  Due to the 7,200 volt transformer on the stern of the dredge not being marine-rated and not being properly sealed, water easily entered the transformer and caused a phase to ground fault and electrical short, which caused the metal structure of the dredge to become energized, causing Caleb Brown to be electrocuted and/or disabled as a result of the presence of electricity.  As a result of being electrocuted and/or disabled by the presence of electricity, Caleb Brown was unable to escape from the cabin on the dredge.

3.53    The dredge was recovered and inspected on April 11, 2019.  The hatch for the starboard compartment of the stern pontoon was missing, and a portable bilge pump was found in the starboard compartment of the stern pontoon, indicating that Mr. Brown had been pumping water out of the starboard stern pontoon.  There was a new doorknob assembly in a box in the operator's cabin that had not been installed.

STRITMATTER KESSLER KOEHLER MOORE

413 - 8th Street
Hoquiam, WA  98550
Tel: 360-533-2710

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22



23
24

COMPLAINT FOR WRONGFUL DEATH - 22

3.54    Investigators filled the pontoons with water after the dredge was recovered, to test for leaks.  The first and fourth compartments on the starboard pontoon leaked.



3.55    The fourth compartment on the starboard pontoon had an area of deterioration on its bottom outside weld seam that measured 31 inches long.  Within that 31-inch area, there were two cracks approximately 6.5 inches long, and an approximately one-half inch hole located between the cracks.

3.56    In addition, a pipe between the third and fourth compartments on the starboard pontoon had a valve that did not close fully, which allowed water to flow from the leaking fourth compartment into the third compartment.

3.57    Pontoon compartments should be kept independent of each other so that if one pontoon compartment fails, the other pontoon compartments will continue to float and provide flotation to the vessel.

COMPLAINT FOR WRONGFUL DEATH - 23

3.58    The MSHA investigation also found a leak in the bottom corner of the second compartment of the starboard pontoon.

3.59    According to the MSHA investigation, Coalview Centralia, LLC employees reported that they had to use pumps to remove water from the pontoons on a regular basis due to leaks in the pontoons.

3.60    At the time of the inspection after the dredge was recovered, two of the three built-in, float-equipped bilge pumps in the center hull were missing, and the third portside aft bilge pump was not functional.

3.61    Defendant Coalview Recovery Group, LLC knew or should have known of the numerous hazardous conditions on the dredge, including water leaks in the pontoons and a transformer on the stern that was not marine-rated.

## IV.    LIABILITY

4.1    As a direct and proximate result of Defendants' tortious conduct, the dredge sank on December 29, 2018, and Caleb Brown drowned.

4.2    Defendant Coalview Recovery Group, LLC failed to exercise reasonable care in carrying out the duties it assumed, including with regard to the safety of the dredge, inspection and maintenance of the dredge, and safe operation of the dredge, pursuant to its contracts with Coalview Centralia, LLC, as discussed above.

4.3    Defendant Dredge Central, LLC manufactured the subject dredge.  Defendant Dredge Central is therefore a product manufacturer and is liable because the dredge was not reasonably safe in its design, was unsafe to an extent beyond that which would be contemplated

COMPLAINT FOR WRONGFUL DEATH - 24

by an ordinary user/consumer, and because adequate warnings and instructions were not provided

with the dredge, as set forth in RCW 7.72.030.

| DRAWN | SCM | DREDGE CENTRAL |
|---|---|---|
| CHECKED | LF | 1016B Louisville Highway |
| APPROVED | | Goodlettsville, Tennessee 37072 |
| | | Phone (615) 859-3733          Fax (615) 859-3795 |

4.4    Pursuant to its contract with Coalview Centralia, LLC, Defendant Coalview

Recovery Group, LLC was responsible for providing the dredge to be used for the coal fines

recovery work and is therefore a product seller under RCW 7.72.010.  On information and belief,

Defendant Coalview Recovery Group, LLC contributed to the design of the subject dredge.[21]

Defendant Coalview Recovery Group, LLC is therefore also liable under RCW 7.72.030 because

the dredge was not reasonably safe in its design, was unsafe to an extent beyond that which would

be contemplated by an ordinary user/consumer, and because adequate warnings and instructions

were not provided with the dredge.

## V. NO CONTRIBUTORY FAULT

5.1    Caleb Brown committed no negligent act that was a proximate cause of his death,

and is fault-free.

---

[21] WEDFA Environmental Facilities Revenue Bonds, 2013 (Coalview Centralia, LLC Project), Limited Offering Memorandum at p.23 ("The feed to the recovery system is accomplished using a CRG-designed all-electric hydraulic coal dredge with a specially-designed cutter head.").

COMPLAINT FOR WRONGFUL DEATH - 25

# VI. DAMAGES

6.1     As a direct and proximate result of Defendants' tortious conduct, Caleb Brown suffered and died, leaving behind a young son, J.L.B.

6.2     Caleb Brown suffered grievous pre-death bodily and mental pain and suffering, anxiety, emotional distress, and fear of his impending death.

6.3     Mr. Brown's surviving son, J.L.B, has suffered and continues to suffer substantial damages as a result of the death of his father, including the loss of his father's financial and emotional support, services, affection, love, care, guidance, training, companionship, instruction and protection.

6.4     The Estate of Caleb Brown sustained economic losses, including funeral and burial expenses and a loss of future earnings.

6.5     Any and all pecuniary losses sustained by Mr. Brown's surviving beneficiaries, in amounts to be proven at the time of trial.

# VII. PRAYER FOR RELIEF

Based upon the foregoing, Plaintiff asks for judgment against the Defendants, jointly and severally, as follows:

a.   A judgment of liability against the Defendants for the Plaintiff's injuries and losses;

b.   Compensation for all economic losses sustained by the Plaintiff and by Caleb Brown's surviving son, J.LB., past and future;

c.   Compensation for all non-economic losses sustained by the Plaintiff and by Caleb Brown's surviving son, J.L.B., past and future;

413 - 8th Street
Hoquiam, WA  98550
Tel: 360-533-2710
STRITMATTER KESSLER KOEHLER MOORE

1

     d.  Pre-judgment interest, to the extent permitted by law;

2

     e.  Reasonable and statutory attorney's fees and costs to the extent permitted by law; and

3

4

     f.  Such other and further relief as the Court deems just.

5

DATED this 3rd day of December, 2021.

6

7

                  STRITMATTER KESSLER KOEHLER MOORE

8

                  /s/ Ray W. Kahler
                  Keith L. Kessler, WSBA #4720
                  Ray W. Kahler, WSBA #26171

9

                  Co-Counsel for Plaintiff

10

                  LAW OFFICES OF KAMELA JAMES

11

12

                    /s/ Kamela J. James
                  Kamela J. James, WSBA #29787
                  Co-Counsel for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT FOR WRONGFUL DEATH - 27